United States District Court
Southern District of Texas
**ENTERED**
June 14, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BLAINE T. BOUDREAUX, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-4050 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| *Respondent*. | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner, represented by retained counsel, filed a habeas petition challenging his 2018 conviction and eighty-year sentence for murder. Respondent filed a motion for summary judgment (Docket No. 8), to which petitioner filed a response in opposition with a cross-motion for summary judgment (Docket Entry No. 12).

Having reviewed the motion, the response, the cross-motion, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment, **DENIES** the cross-motion for summary judgment, and **DISMISSES** this lawsuit for the reasons shown below.

**I. BACKGROUND AND CLAIMS**

A jury convicted petitioner of murder in 2018 and assessed an eighty-year term of imprisonment. The conviction was affirmed on direct appeal, and discretionary review was refused. *Boudreaux v. State*, 631 S.W.3d 319 (Tex. App.—Houston [14th] 2020, pet. ref'd). Petitioner did not file an application for state habeas review.

Petitioner claims in this federal habeas proceeding that the evidence is legally insufficient to support his murder conviction.

## II. FACTUAL BACKGROUND

The intermediate court of appeals set forth the following statement of facts in its opinion affirming petitioner's conviction:

> On April 26, 2015, at 3:03 p.m., appellant drove away from his apartment building in a black pickup truck. The leasing agent, who saw appellant leave the apartment complex, testified that appellant was alone in the truck when he left.
>
> Less than 20 minutes later, at 3:20 p.m., video showed appellant's black pickup truck hitting a car in front of it at a red traffic light (the "First Accident"). The truck hit the car hard enough to push that car into the car in front of it. At the time of the First Accident appellant's pickup truck still had a front bumper and a license plate. There also appeared to be no damage to the truck's front windshield.
>
> Officer Zacchaeus Scott of the Houston Police Department was dispatched to the scene of the First Accident. Scott testified that the accident involved three vehicles and was to the right of the train tracks on Fannin Street. Scott issued a citation to appellant for failure to control speed. The middle vehicle was driven by a mother with a small child in the car. The child was transported to Texas Children's Hospital as a precaution. Scott testified that appellant admitted fault at the accident scene claiming he was distracted by his mobile phone.
>
> Houston Police Officer Chad Long testified that in reviewing the video of the First Accident he observed that appellant was driving erratically. Long testified that right before the First Accident, appellant's truck was straddling the lane marker, and stayed stopped at a green light for approximately 20 seconds after all other cars had driven through the intersection.
>
> Between 5:00 and 5:30 p.m. on the same day, appellant was driving northbound on Weslayan Street when he failed to control speed and failed to stop at a red traffic light hitting the back of a small Smart Car parked at the red

light (the "Second Accident"). Joe Sexton was the driver of the Smart Car, which was the third car stopped at the traffic light. Sexton "heard a screeching sound and looked in the mirror, and there was a truck bearing down on" him. The large black pickup truck crashed into the rear of Sexton's car. Sexton identified appellant as the driver of the truck and testified that immediately after the accident appellant jumped out of the truck to check on Sexton's well-being. Video and still photographs of the Second Accident showed that appellant's front bumper, license plate, and windshield were intact after the accident.

Samantha Mitchell was in the car in front of Sexton's car when the Second Accident happened. Mitchell testified that appellant's truck bumper was intact, and the windshield was not broken. Mitchell testified that all the cars involved in the accident stopped in a service station parking lot so the drivers could conclude the investigation without impeding traffic. After the Second Accident investigation concluded appellant "peeled out" of the service station parking lot at approximately 5:45 p.m. Steve McGinnis, a bystander witness to the Second Accident, testified that no one was in the black truck except the driver.

Approximately 15 to 20 minutes later, Alma Balderas and her husband Jesus were driving near Lockwood Drive and Interstate 10. Alma saw a black pickup truck with a "completely damaged" front end speeding down Lockwood toward I-10. Alma testified that the truck did not have a front bumper and the windshield was damaged. Alma testified that the driver, whom she later identified as appellant, was driving recklessly and appeared to be fleeing. To keep from being hit by the truck Jesus had to drive their car onto the grassy median that separated the lanes on Lockwood. While the truck was stopped at the traffic light Alma and Jesus observed appellant with his head resting on the steering wheel of the truck.

When the light turned green another driver honked because the truck was not moving. Appellant sped away from the intersection, driving approximately 60 or 70 miles per hour. When the truck came to the next intersection, it ran the red light and crashed into a car that was proceeding through the intersection (the "Fourth Accident"). Jesus stopped the Balderas's car; Alma called 911 and went to the scene of the accident. Another bystander pulled a small boy out of the wrecked car, and Alma realized the boy was gravely injured. The boy was later identified as six-year-old Joshua Medrano, who later died from injuries received in the crash.

Jesus also testified about the Fourth Accident and appellant's driving leading up to the accident. Immediately after the accident happened, Jesus went to the scene to try to render aid. Jesus realized first aid would not be helpful and observed appellant walking in circles around his truck. Jesus walked to appellant's truck because it appeared to Jesus that appellant might attempt to flee. Jesus saw appellant opening the truck door appearing to look for something. Jesus testified over objection that he saw appellant take white medicine bottles out of the truck and push them through holes in the fence over I-10.

Officer David Jones of the Houston Police Department Vehicle Crimes Division responded to the scene of the Fourth Accident at 6:11 p.m. on April 26, 2015. By the time Jones arrived patrol units and Fire Department units were on the scene. Jones spoke with appellant at the scene and placed appellant in the back of his patrol car. Appellant was not under arrest at that time but Jones wanted to get a statement from appellant and wanted to make sure appellant did not leave the scene.

Appellant's videotaped statement from the scene of the accident was admitted into evidence without objection. Appellant stated he was the only person in his truck but was unable to explain what happened leading up to the accident. Officer Alfonso Garcia, who interviewed appellant, testified that appellant appeared incoherent during the interview. At one point during the interview, appellant told Garcia that he had been driving his work van when the accident happened, but later corrected himself stating that he was driving his personal truck.

The next day, Officer Nathan Schroeder, a detective in the Houston Police Department Hit-and-Run Division, was dispatched to an area near Texas Spur 5 in Harris County to investigate the offense of failure to stop and render aid ("the Third Accident"). The dispatch was a result of a citizen's report of a body discovered in the area. Schroeder learned during the investigation that the accident occurred the day before on April 26, 2015. The body was later identified as Leonard Batiste, who died as a result of multiple blunt force injuries. Parts of appellant's truck, including the bumper and license plate, were found near Batiste's body. The Dodge emblem from the front of the truck and pieces of the headlamps were also found. Schroeder testified that the license plate found at the scene of Batiste's body was the same license plate number contained in the citation for failure to control speed from the First Accident. The vehicle with that license plate was registered to appellant.

Elizabeth Richey, a forensic examiner in the DNA unit at the FBI laboratory in Quantico, Virginia, worked in the Houston Forensic Science Center at the time of the accident. Richey examined known DNA samples from Batiste and compared them with samples of blood and tissue obtained from appellant's truck. Specifically, Richey tested blood from the exterior front passenger side hood and the back side of passenger side mirror, tissue from the front passenger side door, exterior front passenger's side hood, and passenger's side windshield. In each of the samples Batiste could not be excluded as being the person whose tissue and blood were on the truck. The chances of the blood and tissue not being that of Batiste ranged from 1 in 180 billion to 1 in 10 quintillion.

Charles Cornelius, an investigator with the Harris County District Attorney's Office, drove the suspected route driven by appellant between the Second and Fourth Accidents. Cornelius began driving on Sunday evening at 5:45 p.m., leaving the parking lot of the service station where appellant drove away after the Second Accident. Cornelius drove the same day of the week at the same time of day during the same time of year as the day of the offense. Cornelius drove toward the site of the Fourth Accident passing the site of the Third Accident where Batiste's body was found. The elapsed time was 17 minutes and 55 seconds putting Cornelius at the site of the Fourth Accident at approximately 6:07 p.m. The first 911 calls from the Fourth Accident were made shortly after that time on the date of the accident.

631 S.W.3d at 323–326. In affirming the conviction, the intermediate state court of appeals found the evidence legally sufficient to support petitioner's murder conviction.

### III. LEGAL STANDARDS

A.   <u>Habeas Review</u>

This petition is governed by provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved

5

an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state

> criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.*, at 102–103 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31. This presumption of correctness extends not only to express factual findings, but also to implicit or unarticulated findings which are necessary to the state court's conclusions of mixed law and fact. *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018).

B. <u>Summary Judgment</u>

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant

probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV. ANALYSIS

The intermediate state court of appeals held that the evidence was legally sufficient to support petitioner's murder conviction. 631 S.W.3d at 331. Petitioner argues that the state court's determination was contrary to clearly established federal law as determined by the Supreme Court, and/or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2).

In finding the evidence legally sufficient, the state court reviewed the evidence under the standards of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and held as follows:

8

In reviewing the legal sufficiency of the evidence to support a conviction, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In our review, we consider all of the evidence in the record, whether admissible or inadmissible. The jury is the sole judge of the credibility of witnesses and the weight afforded their testimony. The jury may choose to believe or disbelieve all or a portion of a witness's testimony, and we presume that the jury resolved any conflicts in the evidence in favor of the prevailing party.

\* \* \* \*

Appellant contends in this case that the evidence was insufficient to show that he committed an underlying felony (failure to stop and render aid to Batiste) and that he was either in flight from that felony when he hit and killed Medrano or that he was in furtherance of that felony at the time of the Fourth Accident.

Felony murder essentially is "unintentional" murder committed in the course of a felony. The Penal Code provides that felony murder occurs when a person:

> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3). There is no requirement of a culpable mental state for "the act of murder." Thus, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying committed or attempted felony giving rise to the act.

Under the felony murder statute, the State must prove five things: "(1) an underlying felony, (2) an act clearly dangerous to human life, (3) the death of an individual, (4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ('in the course of and in furtherance of . . . or in immediate flight from')." The "act

9

clearly dangerous to human life" must be the cause of the victim's death. Whether the act is clearly dangerous to human life is measured under an objective standard, not the subjective belief of the actor.

> I. The evidence was sufficient to establish that appellant committed the offense of failure to stop and render aid.

In his first sub-issue appellant argues he did not have the requisite knowledge to commit the offense of failure to stop and render aid (FSRA).

Appellant's indictment for felony murder alleged that the underlying felony offense was FSRA by driving and operating a vehicle that was involved in an accident that resulted in or was reasonably likely to result in death to Batiste. A person commits the felony offense of FSRA if he operates a vehicle involved in an accident that results or is reasonably likely to result in injury to or death of a person and fails to:

> (1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;
>
> (2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;
>
> (3) immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that person requires aid; and
>
> (4) remain at the scene of the accident until the operator complies with the requirements of [Transportation Code] Section 550.023.

TEX. TRANSP. CODE ANN. § 550.021.

Appellant argues the evidence was legally insufficient to show that he knew he had been in an accident that was reasonably likely to have caused a person's death. Appellant acknowledges there was evidence that his truck hit Batiste but argues there was no evidence that appellant was the operator of the truck at the time it hit Batiste or that appellant had knowledge that the accident occurred and that the accident was reasonably likely to result in injury or death of a person.

There is no requirement under the statute that the driver cause the accident or that an eyewitness must see the accident and testify that the driver knew that he was involved in an accident. The culpable mental state for FSRA is established by showing that the accused had knowledge of the circumstances surrounding his conduct, meaning the defendant had knowledge that an accident occurred, and the accident was reasonably likely to result in injury or death of a person.

In this case the jury heard evidence that at 5:45 p.m. appellant sped away from the site of the Second Accident in his black pickup truck with intact bumper, license plate, and windshield. Approximately 25 minutes later, witnesses saw appellant speeding and driving erratically in the black pickup truck, which at that time did not have a bumper, license plate, or intact windshield. The jury also heard evidence that appellant's bumper and license plate were found lying near Batiste's body. Blood and tissue from Batiste were recovered from several locations on appellant's pickup truck. Witnesses to the Second Accident and the Fourth Accident testified that appellant was the sole occupant of the pickup truck. In a videotaped statement appellant also admitted he was the only person in the truck that day.

The jury also heard the testimony of Dr. Merrill Hines, the medical examiner who conducted the autopsy of Batiste. Hines testified that Batiste died from multiple blunt force injuries, which included extensive skull fractures, hemorrhages around the brain, and tears and lacerations of the brain and brain stem. One skull fracture went from ear to ear and was described by Hines as "a specific type of fracture that is generally only seen in very high velocity impacts." Batiste experienced multiple leg fractures in both legs, which are frequently seen when pedestrians are struck by motor vehicles. According to Hines, the fractures reflected that Batiste had been hit from behind on the left side. Batiste's left arm was "essentially amputated by blunt force trauma."

Intent is a question of fact and therefore within the sole purview of the jury for which the jury may rely on its collective common sense and apply common knowledge and experience. A rational jury could conclude that appellant was the individual driving the black pickup truck during the applicable 25-minute window of time. A rational jury could also conclude, relying on its collective common sense and applying its collective common knowledge, that a person driving a vehicle would be aware of an impact so great that it broke the windshield, tore the front bumper off the vehicle, and left tissue and blood from the victim on the vehicle. A rational jury could also conclude that a

person engaged in an impact great enough to cause multiple blunt force injuries including multiple fractures all over the victim's body would have knowledge that the accident was reasonably likely to result in injury or death of a person.

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence was sufficient to establish that appellant was the operator of the truck when it hit and killed Batiste, was aware that an accident had occurred, and was aware of the reasonable likelihood that someone may have been injured or killed in the accident.

> II.   The evidence was sufficient to establish that appellant first committed the offense of FSRA and was in immediate flight from that offense when he struck and killed Medrano.

In appellant's second sub-issue he argues the evidence was insufficient to show that he was in immediate flight from the offense of FSRA when he caused Medrano's death. To convict appellant of felony murder, the State was required to prove a connection between appellant's commission of FSRA and the dangerous act, *i.e.*, appellant hitting and killing Medrano either in the course of and in furtherance of FSRA or in immediate flight therefrom. Appellant contends he was not in flight from the FSRA when he hit and killed Medrano. Specifically, appellant argues the distance between the location of Batiste's body and the Fourth Accident was several miles, and appellant fell asleep at a traffic light right before the Fourth Accident "break[ing] the nexus" between appellant's alleged flight and the dangerous act.

\* \* \* \*

Appellant argues that under the definition of "immediate" announced in *Sweed*, there was no evidence to establish that he was in immediate flight after the commission of the FSRA.

In this case, the jury heard evidence that appellant left the scene of the Second Accident at 5:45 p.m. and caused the Fourth Accident approximately 20 minutes later. When appellant left the Second Accident at 5:45 p.m. witnesses testified that his truck bumper was intact, and they did not see damage to appellant's truck windshield. Witnesses to the Fourth Accident testified that they saw appellant speeding and driving erratically with no bumper on the

12

truck and a damaged windshield. There was no evidence that appellant encountered an "intervening agency" as described by the court in *Sweed*, or that his progress was "separated by other persons or things" during this journey. The jury could have rationally inferred that appellant, in hitting and killing Batiste then hitting and killing Medrano, engaged in one continuous, criminal episode, not in a series of independent incidents.

Appellant argues that his alleged act of falling asleep behind the wheel of the truck while stopped at a red light "[broke] the nexus" of the continuous criminal episode in which he was engaged. Unlike the defendant in *Sweed*, appellant did not engage in an intervening act while in flight from the FSRA that would constitute separation by other persons or things, or an intervening agency. Appellant was seen with his head resting on the steering wheel and another motorist had to honk at appellant to alert him to the changing traffic signal. Appellant's seconds-long interlude at the traffic light did not constitute an intervening circumstance that disrupted his continued flight from the FSRA.

The jury also heard evidence that appellant was driving above the posted speed limit and erratically. Jesus Balderas drove his car onto a grassy median to avoid a collision with appellant. Jesus also testified that after appellant hit the Medrano's car appellant appeared as if he was going to flee the scene of the Fourth Accident, presumably on foot because appellant's truck was disabled. Appellant's attempt to leave the scene of the accident was consistent with one continuous criminal episode and immediate flight from the FSRA. Appellant also gave inconsistent accounts of the Fourth Accident, including appearing not to know which vehicle he was driving.

Viewing the evidence in the light most favorable to the verdict, the evidence was sufficient to establish that appellant was in flight from the FSRA when he committed an act clearly dangerous to human life.

Appellant also asserts the evidence is insufficient to establish that he was in the course of committing the act of FSRA when he committed an act clearly dangerous to human life. Because we have determined the evidence is sufficient to establish immediate flight, we need not address this sub-issue. The elements of felony murder in this case require proof of either immediate flight from the felony or "in furtherance of" commission of the felony. We conclude the evidence was sufficient to support a conviction for felony murder and overrule appellant's first issue.

631 S.W.3d 326–331 (case citations omitted).

Under *Jackson*, the relevant question in a sufficiency of the evidence analysis is whether "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Jackson*, 443 U.S. st 319. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* All credibility choices and conflicts in inferences are to be resolved in favor of the verdict. *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995).

As a result, a federal habeas court "may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the defendant's claims of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991). Consideration of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of witnesses, as those determinations are the exclusive province of the jury. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004). Nor is a federal habeas court authorized to substitute its interpretation of the evidence for that of the fact finder. *Alexander v. McCotter*, 775 F.3d 595, 598 (5th Cir. 1985). Where, as here, a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993).

Petitioner is not entitled to federal habeas relief because he has not shown "that the state court's ruling on the claim being presented in federal court [is] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 561 U.S. at 103. The state court found the evidence legally sufficient to convict petitioner for murder under Texas law, and this Court finds no basis for setting that decision aside. Petitioner has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Respondent is entitled to summary judgment dismissal of petitioner's habeas claim.

## V. CONCLUSION

The motion for summary judgment (Docket Entry No. 8) is **GRANTED**, and petitioner's cross-motion for summary judgment (Docket Entry No. 12) is **DENIED**. This case is **DISMISSED WITH PREJUDICE**. Any and all pending motions are **DENIED AS MOOT**. A certificate of appealability is **DENIED**.

Signed at Houston, Texas, on this the ___ day of June, 2022.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE